IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT ZIMMERMAN,                )
                                 )  Civil Action
          Plaintiff              )  No. 10-cv-02267
                                 )
     vs.                         )
                                 )
NORFOLK SOUTHERN CORPORATION,    )
                                 )
          Defendant              )

                    *    *    *

APPEARANCES:


          DENNIS E. BOYLE, ESQUIRE
          EMILY M. BELL, ESQUIRE
          JOSHUA M. AUTRY, ESQUIRE
          LEONARD G. BROWN, III, ESQUIRE
               On behalf of Plaintiff

          RICHARD K. HOHN, ESQUIRE
               On behalf of Defendant


                    *    *    *


                 O P I N I O N


JAMES KNOLL GARDNER,
United States District Judge

          This matter is before the court on Defendant's Motion

for Summary Judgment filed March 31, 2011, together with the

Brief in Support of Defendant's Motion for Summary Judgment.

Plaintiff's Brief in Opposition to Defendant's Motion for Summary

Judgment was filed April 21, 2011, together with Plaintiff's

Statement of Facts in Response to Defendant's Motion for Summary

Judgment.  As permitted by my Order dated May 11, 2011, Defendant's Statement of Uncontested Facts was filed on May 19, 2011, and Plaintiff's Response to Defendant's Statement of Uncontested Facts was filed June 1, 2011.

Defendant, Norfolk Southern Corporation's[1] Brief in Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment was filed May 25, 2011.  Plaintiff's Sur-Reply Brief in Opposition to Defendant's Motion for Summary Judgment was filed, with permission, on June 21, 2011.

For the following reasons, I grant Defendant's Motion for Summary Judgment and enter judgment in favor of defendant and against plaintiff.  Specifically, I conclude that all of plaintiff's state-law negligence claims in Counts II and III of plaintiff's Complaint, and most of the excessive speed portion of plaintiff's state-law negligence claim in Count I,[2] are preempted

_____

[1]     Defendant avers that "Norfolk Southern Corporation" is not the proper party defendant because the owner and operator of the tracks and equipment, and the employer of the train crew, is "Norfolk Southern Railway Company".  Because neither party has moved to amend the caption, the Opinion and Order will refer to "Norfolk Southern Corporation" as the party defendant.

[2]     Count I alleges that defendant was negligent for failing to warn of an approaching train by operating the train at an excessive speed, without lights, and without adequately sounding the train's horn.

As discussed more fully below, I hold that most of the excessive speed portion of Count I is preempted by the FRSA.  I also hold that a dispute exists regarding track classification, which may not be preempted by the FRSA.  Nonetheless, because I hold that the dispute is not material, defendant is entitled to summary judgment because no genuine issues of material fact exist.

by the Federal Railroad Safety Act of 1970 ("FRSA"), 49 U.S.C. §§ 20101-28505.[3]

Regarding the remaining portions of plaintiff's state-law negligence claim in Count I, that defendant breached a duty by failing to adequately sound the train's horn and illuminate the train's lights, I further conclude that there are no genuine issues of material fact which would preclude summary judgment in defendant's favor.  Finally, I dismiss the claim for punitive damages in Count IV as moot.

<u>JURISDICTION</u>

Jurisdiction in this case is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.  Plaintiff is an individual who is a citizen of Pennsylvania.  Defendant is a Virginia corporation with its principal place of business in Virginia.  The amount in controversy exceeds $75,000.00 exclusive of interests and costs.

<u>VENUE</u>

Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because the events giving rise to plaintiff's claims allegedly occurred in Lancaster County, Pennsylvania, which is located within this judicial district.

---

[3]     The Federal Railroad Safety Act of 1970 was originally codified in 45 U.S.C. §§ 421-447, but was repealed by Pub. L. No. 103-272, § 7(b), 108 Stat. 1379 (Jul. 5, 1994), and now has provisions contained in 49 U.S.C. §§ 20101-28505.  However, because it appears that these provisions are still generally referred to as the FRSA, despite that fact that the original FRSA has been repealed, I will also follow this designation for ease of reference.

PROCEDURAL HISTORY

Plaintiff Robert Zimmerman initiated this action on May 14, 2010 by filing a four-count civil Complaint against defendant Norfolk Southern Corporation ("Norfolk Southern").  The Complaint alleges claims for negligence arising out of a collision at a railroad crossing between plaintiff's motorcycle and a train operated by Norfolk Southern.

Count I alleges a negligence claim for failure to warn of an approaching train.  Count II is a claim for negligent failure to maintain a safe grade crossing, which is the place where the railroad tracks intersect the public road.  Count III alleges negligence per se for failure to properly mark and secure the crossing in accordance with 23 C.F.R. § 646.214.  Count IV is a claim for punitive damages.

On June 22, 2010 defendant filed its Answer to Plaintiff's Complaint with Affirmative Defenses.  On September 16, 2010, I conducted a Rule 16 Status Conference by telephone and set a deadline for defendant to file the within motion.  As noted above, defendant filed its motion for summary judgment on March 31, 2011.  Hence this Opinion.

STANDARD OF REVIEW

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of

-4-

material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-2510, 91 L.Ed.2d 202, 211 (1986); Federal Home Loan Mortgage Corporation v. Scottsdale Insurance Company, 316 F.3d 431, 443 (3d Cir. 2003).  Only facts that may affect the outcome of a case are "material".  Moreover, all reasonable inferences from the record are drawn in favor of the non-movant.  Anderson, 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216.

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof.  See Watson v. Eastman Kodak Company, 235 F.3d 851, 857-858 (3d Cir. 2000).  Plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather he must present competent evidence from which a jury could reasonably find in his favor.  Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa. 1995).

FACTS

The Accident

Based upon the pleadings, record papers, exhibits, and the parties' respective concise statements of fact, the pertinent

facts for purposes of the motion for summary judgment are as follows.

The accident in this case occurred shortly after 10:00 o'clock p.m. on June 12, 2008 in the Borough of New Holland, Lancaster County, Pennsylvania.  Plaintiff Robert Zimmerman, a thirty-eight year old man, was operating a motorcycle southbound on Diller Avenue.  Plaintiff was wearing a full-face helmet with visor.

Two of defendant's locomotives, designated 5657 and 5656, were approaching Diller Avenue from the west.  The conductor, Steven Romberger, and the locomotive engineer, Douglas Eppley, were employees of Norfolk Southern who were stationed in the head end of the lead locomotive, 5657.

The Norfolk Southern train entered the Diller Avenue crossing and plaintiff, who had been traveling approximately thirty to thirty-five miles per hour, at or below the posted speed limit on Diller Avenue,[4] was unable to stop in time to

---

[4]     Defendant appears to concede that plaintiff was traveling at or below the applicable speed limit.  Defendant's Motion for Summary Judgment ("Motion for Summary Judgment"), filed March 31, 2011, pages 3 and 7; Defendant's Statement of Uncontested Facts, filed May 19, 2011, page 1. Although the fact that plaintiff was traveling within the speed limit does not appear to be in dispute, the applicable speed limit for the stretch of road has alternatively been stated as either thirty or thirty-five miles per hour.

The pleadings and briefs of both parties consistently refer to the applicable speed limit as thirty miles per hour, and state that Mr. Zimmerman was traveling at or below the speed limit.

However, plaintiff's expert, William J. Vigilante Jr., and defendant's expert, Steven M. Schorr, both state in their expert reports that

(Footnote 4 continued):

-6-

avoid an accident.  Plaintiff locked his brakes and flew over the front handlebars of his motorcycle, and his body impacted the fuel tank of locomotive 5657.  Plaintiff was airlifted to Lancaster General Hospital, and he suffered extensive injuries.

In his deposition, plaintiff contended that he had no recollection of the accident.  Plaintiff stated that he was familiar with the Diller Avenue crossing and had traveled over the crossing hundreds of times, beginning when he was a teenager. Plaintiff also stated that he was familiar with the signs indicating a railroad crossing at Diller Avenue, and that he knew they signaled a railroad crossing was present.  However, plaintiff averred that he had never seen a train cross the tracks, and that he believed the tracks were no longer in use. Accordingly, plaintiff explained that he could not state that he had a habit of looking both ways and slowing down while

---

(Continuation of footnote 4):

the applicable speed limit was reported as thirty-five miles per hour.  Motion for Summary Judgment, Exhibit Vol. II, Q, page 2, and S, page 1.  Later in Mr. Schorr's report, he additionally states that there is a thirty miles per hour speed limit posted approximately four hundred feet north of the grade crossing, and he does not address which speed limit is accurate.  Motion for Summary Judgment, Exhibit Vol. II, S, pages 3-5.  Plaintiff's second expert, David Nelson, states in his expert report that Mr. Zimmerman was traveling thirty-five miles per hour, and that Mr. Zimmerman was not in violation of the speed limit.  Motion for Summary Judgment, Exhibit Vol. II, R.

Accordingly, whether the speed limit was thirty or thirty-five miles per hour, the parties appear to agree that Mr. Zimmerman was traveling at or below the applicable speed limit.  Additionally, neither party contends that, to the extent there is any dispute about plaintiff's rate of speed, any such dispute is material.

approaching the Diller Avenue crossing because he did not expect to see a train on the tracks.

At the time of the collision, each locomotive was equipped with a digital recording device, known as Event Data Recorders, which recorded information such as speed and horn activation.  According to the Event Data Recorders, which information was confirmed by Mr. Eppley and Mr. Romberger in their depositions, the train was traveling approximately twenty-four miles per hour at the time of the accident.  The track upon which the train was traveling is classified pursuant to federal regulations as a Class 3 Track, which has a maximum allowable speed of forty miles per hour.

The Event Data Recorders also provided information, confirmed by Mr. Eppley and Mr. Romberger, that the train horn was activated continually from a point of approximately one quarter mile prior to the crossing and through the crossing, and that the horn was sounded for approximately forty-five seconds total.

Plaintiff contends in his deposition that he has no recollection of whether or not the train sounded its horn. However, in his affidavit, plaintiff states that if he had heard a train horn, he would have stopped prior to reaching the Diller Avenue crossing.

Both the driver and a passenger in a car traveling sixty feet behind plaintiff as he approached the Diller Avenue crossing stated in affidavits that they heard the train sound its horn.  Neither witness reported seeing train lights, but plaintiff averred in his Complaint that because of the angle of the track and the location of Shooter's Crossing, a tavern on the north side of the track, he would not have been able to see train lights upon approaching Diller Avenue crossing even if they had been operating.

<u>The Diller Avenue Crossing</u>

The Diller Avenue crossing was marked with yellow warning signs placed close to the crossing, and with crossbucks, which are x-shaped signs placed on posts that read "railroad crossing", placed at the site of the crossing itself.  The crossing did not have pavement markings, nor was it equipped with flashing lights or automated gates.  Shooter's Crossing obscures vision of the track to the west until one is within less than forty feet of the crossing.

On April 29, 1985, the Pennsylvania Department of Transportation entered into an agreement with Consolidated Rail Corporation[5] for the installation of reflectorized crossbucks at public highways that cross railroad tracks owned and maintained

---

[5]     Consolidated Rail Corporation is the former possessor of the Diller Avenue crossing.

-9-

by Consolidated Rail Corporation.  Under the terms of that agreement, federal funds were to be used in the installation of the crossbucks pursuant to the Highway Safety Act of 1973, 23 U.S.C. § 130.

On August 11, 1986, the crossing at Diller Avenue was inspected by a Pennsylvania Public Utility Commission ("PUC") official, and the proposed crossbuck installation was approved. The crossbucks were installed in 1987, with the use of federal funds, in accordance with the Manual on Uniform Traffic Control Devices ("MUTCD") standards, which is the national standard for all traffic control devices set by the Federal Highway Administration.  23 C.F.R. § 655.603.

<u>CONTENTIONS OF THE PARTIES</u>

<u>Defense Contentions</u>

Defendant contends that it is entitled to summary judgment on all four counts for four reasons.  First, it argues plaintiff violated Pennsylvania law by failing to stop his motorcycle after the train sounded its horn, as he is required to do pursuant to 75 Pa.C.S.A. § 3341.  Furthermore, defendant contends that plaintiff was under a common-law duty to "stop, look, and listen" for a train upon entering the crossing. <u>Krentz v. Consolidated Rail Corporation</u>, 589 Pa. 576, 910 A.2d 20 (Pa. 2006).

Defendant avers that it discharged its sole duty to sound the train's horn upon entering the crossing, and that plaintiff bore the onus to stop before the crossing.  <u>Id.</u> Because plaintiff has neither alleged nor produced evidence that he stopped before the crossing, defendant argues that plaintiff is responsible for the accident, and therefore defendant is not liable.

Second, defendant avers that plaintiff's claims, to the extent they allege negligent design or unsafe maintenance of the Diller Avenue crossing, are preempted by state law.  Defendant contends that the PUC has exclusive jurisdiction to appropriate property for railroad crossings, to prescribe the manner in which such crossing shall be maintained, operated, and protected, and to order the alteration of crossings should they become dangerous after their creation.  66 Pa.C.S.A. § 2702; <u>National Freight, Inc. v. Southeastern Pennsylvania Transportation Authority</u>, 698 F.Supp. 74, 78 (E.D.Pa. 1988).

Third, defendant alleges plaintiff's claims regarding the train's speed and the warnings installed at a railroad crossing are preempted by federal law.  Defendant contends that because federal funds were utilized in the installation of the crossing warning devices at Diller Avenue crossing, plaintiff is precluded from claiming that the railroad was negligent because such devices were inadequate.  <u>Norfolk Southern Railway</u>

<u>Company v. Shanklin</u>, 529 U.S. 344, 352-353, 120 S.Ct. 1467, 1474, 146 L.Ed.2d 374, 382-383 (2000).

Further, defendant alleges that plaintiff's claim that the train was traveling at an excessive speed is preempted because the Federal Railroad Administration ("FRA") has promulgated regulations on train speed, pursuant to the FRSA, which regulations preclude states from imposing an independent duty on the railroad.  49 U.S.C. § 20106; 49 C.F.R. § 213.9; <u>CSX Transportation, Inc. v. Easterwood</u>, 507 U.S. 658, 676, 113 S.Ct. 1732, 1743-1744, 123 L.Ed.2d 387, 404 (1993). Accordingly, because the train was operating within the speed limit established by the FRA for a Class 3 track, defendant contends plaintiff is preempted from arguing that the train should have been traveling at a lower rate of speed.

Finally, defendant contends that plaintiff has not otherwise provided any evidence that defendant breached a duty. Defendant avers that plaintiff has not adduced any evidence to support his claim that the train was running without lights. Defendant alleges that both Mr. Romberger and Mr. Eppley have stated that the headlights of the train were on, and that the train also had two oscillating auxiliary lights that were flashing while the horn was sounding.

Furthermore, defendant contends that whether the train's lights were illuminated is not a material fact because

plaintiff has produced no evidence that the failure to operate the train's lights was a cause of the accident.  In addition, defendant avers that plaintiff admitted that even if the train's lights had been on, he would not have been able to see them because of the angle of the track and the placement of Shooter's Crossing.

Regarding the sounding of the train's horn, defendant argues that there is no dispute that the horn was sounded before and through the crossing because, many witnesses testified they heard the horn, and plaintiff has produced no evidence to the contrary.  Finally, defendant contends that it did not breach a duty with regard to the alleged sight obstruction, Shooter's Crossing, because defendant has no legal duty to eradicate a sight obstruction off of its right of way.

<u>Contentions of Plaintiff</u>

In response to defendant's contention that plaintiff's claims are preempted by state law, plaintiff avers that Pennsylvania case-law makes clear that the PUC's authority over rail-crossing safety does not obviate a railroad's common-law duty to provide adequate warning devices at crossings, <u>Shaup v. Frederickson</u>, 1998 WL 726650, at *6 (E.D.Pa. Oct. 16, 1998)(Buckwalter, J.), and to exercise ordinary care at a crossing by properly maintaining warning devices and warning motorists of the approach of a train.  <u>Dobranksy v. CSK</u>

Transportation, Inc., 31 Pa. D. & C.4th 58, 61-62 (Pa.Com.Pl. 1996).

Plaintiff contends that defendant's reliance on National Freight is misplaced because it overlooked the controlling Pennsylvania case of Marinelli v. Montour Railroad Company, 278 Pa.Super. 403, 409, 420 A.2d 603, 606 (Pa.Super. 1980), which held that the railroad's common-law duties survive despite the authority given to the PUC under 66 Pa.C.S.A. § 2702.

In response to defendant's contention that plaintiff's claims are preempted by federal law, plaintiff contends that in 2007 Congress amended the express preemption provision in the FRSA, 49 U.S.C. § 20106, which renders the plaintiff's negligence claims no longer preempted by federal law.  Plaintiff argues that 49 U.S.C. § 20106(b) allows state-law causes of action based upon violations of federal statutes or regulations, state statutes, regulations or orders, and a railroad's internal standards or rules.

Accordingly, plaintiff contends that the amendments supercede the United States Supreme Court's determination in Easterwood, supra, that state-law excessive speed claims are preempted by the FRSA.  Plaintiff avers that Norfolk Southern's internal speed limit for the Diller Avenue crossing stretch of track is ten miles per hour, which is information the railroad

-14-

has reported to the FRA and the United States Department of Transportation.

In addition, plaintiff argues that the 2007 amendments to the FRSA supercede Shanklin, supra, wherein the United States Supreme Court held that state-law claims alleging inadequate warning devices at a railroad crossing, when the devices were installed with federal funds, are preempted.  Plaintiff alleges that because of the sight lines and minimum visibility clearances at the Diller Avenue crossing, federal regulations require flashing lights and crossing gates at the crossing. 49 C.F.R. §§ 234.203, 234.225; 23 C.F.R. § 646.214(b)(3)(i)(E). Further, plaintiff argues that the placement and condition of the crossbucks do not comply with the standards set out in the MUTCD.

Plaintiff further contends that Norfolk Southern has repeatedly misrepresented in its accident reports submitted to the FRA that there are no sight obstructions at the Diller Avenue crossing, despite the obstruction caused by Shooter's Crossing. Plaintiff also avers that Norfolk Southern has been in violation of its internal policies which require it to inspect crossings to identify physical conditions that limit views, such as buildings.[6]  Plaintiff contends that Norfolk Southern's internal policies also provide for methods to remedy the diminished sight

---

[6]     Plaintiff's Statement of Facts in Response to Defendant's Motion for Summary Judgment ("Plaintiff's Statement of Facts"), filed April 21, 2011, Exhibit 14, Corporate Procedure 400.2, pages 2 and 4.

-15-

distance, such as installing active crossing devices – gates and lights – and warning motorists to reduce speed or to stop by installing road signs.[7]

In addition, plaintiff alleges that even prior to the 2007 amendments to the FRSA, the United States Court of Appeals for the Third Circuit made clear that negligence claims regarding sight distance and unsafe grade crossings are not preempted by the FRSA. Strozyk v. Norfolk Southern Corporation, 358 F.3d 268 (3d Cir. 2004). Plaintiff contends that Strozyk establishes that railroads have a common-law duty to keep visibility at grade crossings free from obstruction and to provide a safe crossing. 358 F.3d at 277.

Regarding defendant's remaining arguments that plaintiff was negligent for failing to stop at the crossing and that Norfolk Southern failed to breach any duty, plaintiff avers that genuine issues of material fact exist regarding both parties' respective duties.

Plaintiff contends that the Third Circuit has established that the railroad's duty to warn of an approaching train is heavily fact-contingent, and it is not necessarily satisfied merely because a train sounded its horn. Strozyk, 358 F.3d at 277-278. Because plaintiff avers that the view of the tracks was obstructed, and that there was a dispute regarding

---

[7]   Plaintiff's Statement of Facts, Exhibit 10, Norfolk Southern Grade Crossing Collision Investigation.

whether the train's lights were illuminated, whether the train's horn was sounded, and whether the train was speeding, plaintiff alleges that there is sufficient evidence to establish that Norfolk Southern breached its duty to warn of an approaching train.

Finally, because plaintiff stated in his deposition the general proposition that he would normally slow as he approached a railroad crossing, plaintiff contends that this evidence is sufficient to establish that he had a habit of slowing down, stopping, and looking whenever crossing at the Diller Avenue intersection in particular.[8]

## DISCUSSION

## State Law Preemption

Defendant contends that plaintiff's negligence claims in Counts I-III are preempted by 66 Pa.C.S.A. § 2702, which provides the PUC with authority regarding the construction, relocation, suspension and abolition of railroad crossings.

---

[8]     Plaintiff additionally contends that defendant's motion for summary judgment should be denied because it failed to comply with my Rule 16 Status Conference Order, dated September 16, 2010, requiring it to file a statement of undisputed material facts.  Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Brief in Opposition"), filed April 21, 2011, pages 3-4.

     However, defendant filed Defendant's Statement of Uncontested Facts on May 19, 2011, as permitted by my May 11, 2011 Order (Document 34). Also as permitted by that Order, plaintiff filed a responsive statement. Therefore, I deny plaintiff's claim that defendant's motion for summary judgment should be denied on this ground.

Section 2702 provides, in relevant part:

(a) General rule. --No public utility, engaged in the transportation of passengers or property, shall, without prior order of the commission, construct its facilities across the facilities of any other such public utility or across any highway at grade or above or below grade, or at the same or different levels; and no highway, without like order, shall be so constructed across the facilities of any such public utility, and, without like order, no such crossing heretofore or hereafter constructed shall be altered, relocated, suspended or abolished.

(b) Acquisition of property and regulation of crossing. --The commission is hereby vested with exclusive power to appropriate property for any such crossing...and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated, suspended or abolished, and the manner and conditions in or under which such crossings shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public. The commission shall require every railroad the right-of-way of which crosses a public highway at grade to cut or otherwise control the growth of brush and weeds upon property owned by the railroad within 200 feet of such crossing on both sides and in both directions so as to insure proper visibility by motorists.

(c) Mandatory relocation, alteration, suspension or abolition. --Upon its own motion or upon complaint, the commission shall have exclusive power after hearing, upon notice to all parties in interest, including the owners of adjacent property, to order any such crossing heretofore or hereafter constructed to be relocated or altered, or to be suspended or abolished upon such reasonable terms and conditions as shall be prescribed by the commission.  ....

....

-18-

> (f) Danger to safety. --Upon the commission's
> finding of an immediate danger to the safety and
> welfare of the public at any such crossing, the
> commission shall order the crossing to be
> immediately altered, improved, or suspended.
> Thereafter hearing shall be held and costs shall
> be allocated in the manner prescribed in this
> part.

66 Pa.C.S.A. § 2702(a)-(c), (f).

Defendant asserts that these provisions abdicate any common-law duty railroads have to provide adequate warning devices at a crossing and to determine when alterations to the crossing are necessary because the crossing presents a danger to the public.  Defendant cites National Freight for the proposition that, because the PUC has exclusive authority to design and construct railroad crossings, a plaintiff cannot bring a cause of action for defective railroad crossing design.  698 F.Supp. at 78.

However, case-law regarding the common-law duties of railroads makes clear that "a railroad company is required to maintain crossings of its railways with public highways that are safe for travelers upon the highways." Marinelli, 278 Pa.Super. at 409, 420 A.2d at 606.  The Superior Court of Pennsylvania in Marinelli explains that a railroad will be liable for its negligence in failing to continuously maintain a crossing in a safe condition, notwithstanding 66 Pa.C.S.A. § 2702. 278 Pa.Super. at 410-411, 420 A.2d at 607.

Further, in interpreting Pennsylvania law, the United States Court of Appeals for the Third Circuit has held that a

-19-

railroad has a common-law duty to warn travelers of an approaching train, which may require a railroad to provide additional warning devices in the crossing.  Bouchard v. CSX Transportation, Inc., 196 Fed.Appx. 65, 70-71 & n.4 (3d Cir. 2006); see also Dobransky, 31 Pa. D. & C.4th at 61.

In addition, nothing in the text of 66 Pa.C.S.A. § 2702 indicates that it relieves railroads of their common-law duties to make the crossing safe for travelers.  Accord Shaup, 1998 WL 726650, at *6.  The text of the statute does not support the interpretation that, in the absence of an order issued by the PUC requiring alteration of the crossing, a railroad company has no duty to maintain the crossing in a safe condition or to adopt safe methods of guarding the crossing.  Such an interpretation would present a drastic departure from the common-law duties otherwise imposed on a railroad company.  See Marinelli, 278 Pa.Super. at 409-410, 420 A.2d at 606-607.

Further, defendant has produced no evidence that the legislature intended "to abrogate a long settled principle of state tort law."  Shaup, 1998 WL 726650, at *7.  Accordingly, defendant has failed to establish that plaintiff's claims are preempted by 66 Pa.C.S.A. § 2702.

Because I conclude that plaintiff's state-law negligence claims are not preempted by state statute, I consider

-20-

defendant's alternative argument that they are preempted by federal law.

Federal Law Preemption

Defendant contends that plaintiff's claims, that the train was operating at an excessive speed and that the crossbucks constituted inadequate warning signals at the crossing, are preempted by the FRSA, 49 U.S.C. §§ 20101-28505.

Federal preemption is premised on the Supremacy Clause of the United States Constitution, which states that where state law conflicts with, or frustrates, federal law, the latter "shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2; Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721 (1985).

State action may be preempted by federal law in three circumstances: (1) where Congress expressly preempts state action; (2) where Congress impliedly preempts state action because of the depth and breadth of a congressional scheme that occupies a legislative field and; (3) where state law conflicts with federal law.  Lorillard Tobacco Company v. Reilly, 533 U.S. 525, 541, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532, 550 (2001); Bruesewitz v. Wyeth Inc., 561 F.3d 233, 238-241 (3d Cir. 2009).  Here, defendant contends that federal law expressly preempts plaintiff's state-law negligence claims.

-21-

Federal preemption analysis must begin with determining the "purpose of Congress" in enacting the federal law in question.  Wyeth v. Levine, ___ U.S. ___, ___, 129 S.Ct. 1187, 1194, 173 L.Ed.2d 51, 60 (2009)(internal quotation omitted); Rooney v. City of Philadelphia, 623 F.Supp.2d 644, 663 (E.D.Pa. 2009)(Robreno, J.).

The FRSA's stated purpose is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."  49 U.S.C. § 20101.  The Secretary of Transportation is authorized to prescribe regulations and issue orders "for every area of railroad safety".  49 U.S.C. § 20103(a).

Furthermore, Congress enacted an express preemption provision:

> (a) National uniformity of regulation.
>
>> (1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
>
>> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--

-22-

> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> (B) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (C) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106(a).

Accordingly, this preemption provision displaces the state's authority to regulate railroad safety when a federal regulation covers the same subject matter as the state requirement.  A state may adopt more stringent requirements in only three limited circumstances.  The United States Supreme Court has held that state common law can also be preempted by federal regulations on railroad safety.  <u>Easterwood</u>, 507 U.S. at 664, 113 S.Ct. at 1737, 123 L.Ed.2d at 396-397.

*Inadequate Signalization*

Counts II and III of plaintiff's Complaint each allege that Norfolk Southern had a duty to provide flashing lights or crossing gates because the crossbucks were not sufficient means of guarding the Diller Avenue crossing.  Count II alleges that this duty arises from the common-law duty to maintain a safe grade crossing.  Count III alleges that this duty arises from a federal standard of care created in 23 C.F.R. § 646.214, which, in relevant part, requires automatic gates and flashing lights

-23-

for crossings with unusually restricted sight distances.
23 C.F.R. § 646.214(b)(3)(i)(E).

Specifically, section 646.214(b) provides as follows:

(b) Grade crossing improvements.

(1) All traffic control devices proposed shall comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards.

(2) Pursuant to 23 U.S.C. 109(e), where a railroad-highway grade crossing is located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of the existing roadway, the crossing shall not be opened for unrestricted use by traffic or the project accepted by [the Federal Highway Administration] until adequate warning devices for the crossing are installed and functioning properly.

(3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

....

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

-24-

       (F) A diagnostic team recommends them.

       (ii) In individual cases where a diagnostic team justifies that gates are not appropriate, [the Federal Highway Administration] may find that the above requirements are not applicable.

       (4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of [the Federal Highway Administration].

23 C.F.R. § 646.214(b) (emphasis added).

      The United States Supreme Court and the United States Court of Appeals for the Third Circuit, in interpreting 23 C.F.R. § 646.214, have held that when federal funds are used in the installation of warning devices, state-law claims that these devices were inadequate are preempted.  Shanklin, 529 U.S. at 352-355, 120 S.Ct. at 1473-1475, 146 L.Ed.2d at 382-384; Strozyk, 358 F.3d at 276.

      Specifically, because section 646.214(b) displaces state and private decision-making authority regarding the selection of warning devices, states cannot impose an independent duty on railroads to install different or additional warning devices.  Shanklin, 529 U.S. at 352-353, 120 S.Ct. at 1474, 146 L.Ed.2d at 382-383.

The Supreme Court stated that "[w]hether the State should have originally installed different or additional devices, or whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, is immaterial to the pre-emption question." Shanklin, 529 U.S. at 358, 120 S.Ct. at 1476, 146 L.Ed.2d at 386.

There is no dispute that federal funds were used in the installation of the crossbucks at the Diller Avenue crossing. Accordingly, plaintiff's negligence claims asserting that defendant should have installed different warning devices are preempted by federal law.

Plaintiff contends that although his claims may have been preempted under the Supreme Court's 2000 decision in Shanklin, the state of the law subsequently changed in 2007 when Congress amended the preemption provision in the FRSA. At that time, Section 20106 was amended in response to, and in order to rectify, two federal court decisions arising from a particularly devastating railroad accident which occurred on January 18, 2002. The accident involved a train which derailed and released anhydrous ammonia. H.R. Conf. Rep. No. 110-259, at 351 (2007), *as reprinted in* 2007 U.S.C.C.A.N. 119, 326; see Murrell v. Union Pacific Railroad Company, 544 F.Supp.2d 1138, 1145 (D.Or. 2008).

In the two federal decisions arising from that accident, each court concluded that plaintiffs' state-law

negligence claims were preempted because the relevant federal regulations on railroad safety subsumed the subject matter. Lundeen v. Canadian Pacific Railroad Company, 447 F.3d 606 (8th Cir. 2006); Mehl v. Canadian Pacific Railroad, Limited, 417 F.Supp.2d 1104, 1108 (D.N.D. 2006).  Without conducting any inquiry into the purpose of the federal regulations, and despite the fact that the railroad had failed to comply with the federal regulations regarding inspecting track and rail cars, those courts held that plaintiffs' common-law claims were preempted. Lundeen, 447 F.3d at 613-615; Mehl, 417 F.Supp.2d  at 1108-1109.

In response, Congress amended 49 U.S.C. § 20106 by adding subsections (b) and (c).  These subsections provide as follows:

> (b) Clarification regarding State law causes of action.
>
> > (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party--
> >
> > > (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

-27-

> (B) has failed to comply with its own
> plan, rule, or standard that it created
> pursuant to a regulation or order issued
> by either of the Secretaries; or
>
> (C) has failed to comply with a State
> law, regulation, or order that is not
> incompatible with subsection (a)(2).
>
> (2) This subsection shall apply to all
> pending State law causes of action arising
> from events or activities occurring on or
> after January 18, 2002.
>
> (c) Jurisdiction. Nothing in this section creates
> a Federal cause of action on behalf of an injured
> party or confers Federal question jurisdiction for
> such State law causes of action.

49 U.S.C. § 20106 (b) and (c).

Plaintiff contends that the placement of the building, Shooter's Crossing, at the Diller Avenue crossing resulted in "unusually restricted sight distance" under 23 C.F.R. § 646.214(b)(3)(i)(E), thereby requiring the installation of automatic gates and flashing lights.  Plaintiff asserts that section 646.214 creates a federal standard of care with which Norfolk Southern failed to comply.  Accordingly, plaintiff contends that he is able to bring a state-law negligence claim for this failure pursuant to 49 U.S.C. § 20106(b)(1)(A).

Although the Third Circuit has not yet construed the recent amendments to the FRSA, several courts which have addressed plaintiff's exact argument have held that Congress did not overrule the preemption analysis set forth in <u>Shanklin</u>. <u>Nickels v. Grand Truck Western Railroad, Inc.</u>, 560 F.3d 426, 432

-28-

(6th Cir. 2009); <u>Henning v. Union Pacific Railroad Company</u>, 530

F.3d 1206, 1214-1216 (10th Cir. 2008); <u>Murrell v. Union Pacific</u>

<u>Railroad Company</u>, 544 F.Supp.2d 1138, 1145 (D.Or. 2008); <u>Frazier</u>

<u>v. Burlington Northern Santa Fe Corporation</u>, 788 N.W.2d 770, 776-

777 (Minn.Ct.App. 2010); <u>Kill v. CSX Transportation, Inc.,</u> 923

N.E.2d 1199, 1208 (Ohio Ct.App. 2009); <u>Mastrocola v. Southeastern</u>

<u>Pennsylvania Transportation Authority</u>, 941 A.2d 81, 90 & n.12

(Pa.Commw. 2008).

Specifically, unlike the regulations regarding

inspecting track and rail cars in <u>Lundeen</u> and <u>Mehl</u>, the United

States Court of Appeals for the Tenth Circuit in <u>Henning</u> held

that 23 C.F.R. § 646.214(b) did not establish a "Federal standard

of care" for purposes of 49 U.S.C. § 20106(b)(1)(A). <u>Henning</u>,

530 F.3d at 1215. Instead, section 646.214 removes from the

states and railroads the final authority to decide what warning

system is needed. <u>Henning</u>, 530 F.3d at 1215. I find persuasive

the reasoning of the Tenth Circuit in <u>Henning</u>, and I hold that,

as a matter of law, Norfolk Southern cannot be liable for failure

to comply with section 646.214(b) in this context. <u>Id.</u>

Plaintiff has failed to identify any authority

supporting his position that Congress intended the amendments to

section 20106 to supercede <u>Shanklin</u>, or that section 646.214(b)

establishes a federal standard of care. Therefore, I hold that

plaintiff's negligence claims based upon inadequate signalization are preempted by federal law.[9]

Accordingly, I grant defendant's motion for summary judgment on plaintiff's negligence claims in Counts II and III, and enter judgment in favor of defendant and against plaintiff on those claims.[10]

---

[9]    Plaintiff correctly notes that the Third Circuit in Strozyk held that section 646.214(b) only preempts claims regarding the adequacy of warning devices, and that it does not preempt the common-law duty to maintain a safe grade crossing.  The Third Circuit held that railroads continue to have the common-law duty "to provide a reasonably safe grade crossing", "such as the duty to keep visibility at grade crossings free from obstructions."  Strozyk, 358 F.3d at 276-277 (internal quotations omitted).

However, the obstructions to which Strozyk referred were allegations of excessive vegetation blocking or limiting the sight lines of the track.  Although plaintiff's Complaint alleged that foliage obstructed the signs leading up to the crossing, upon review of plaintiff's briefs, it appears that plaintiff is not maintaining that allegation.  Therefore, I conclude that plaintiff is not pursuing a negligence claim based upon defendant's failure to maintain the vegetation at the Diller Avenue crossing.

The sight obstruction identified by plaintiff is a building, Shooter's Crossing, which plaintiff contends made visibility for both trains and drivers on the road unsafe.  He asserts that defendant was negligent in failing to remove the building.

In order to establish a prima facie claim for negligence, the elements are: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the defendant's breach of the duty and the resulting injury; and (4) actual loss or damage suffered by the plaintiff. Rooney v. City of Philadelphia, 623 F.Supp.2d 644, 660 (E.D.Pa. 2009) (Robreno, J.).

Plaintiff has not established that defendant has a duty to remove a privately owned building that potentially obscure sight lines, where the building is located off of the railroad's right of way.  Strozyk only addressed excessive vegetation that the railroad had a duty to maintain. Plaintiff cites no authority for the proposition that defendant had a duty to modify or remove a privately owned building which is located off the railroad's right of way.  Accordingly, I conclude that plaintiff has not made out a prima facie case for negligence based upon these facts.

[10]    Plaintiff additionally argues that the amendments to section 20106 allow him to bring negligence claims for Norfolk Southern's violations of its own internal policies, pursuant to 49 U.S.C. § 20106(b)(1)(B).  Plaintiff avers that Shooter's Crossing presented an obstruction off of the railroad's

(Footnote 10 continued):

-30-

*Excessive Speed*

Count I of plaintiff's Complaint brings a claim for negligence for failure to warn of an approaching train.  Part of plaintiff's claim alleges that Norfolk Southern was operating locomotives 5656 and 5657 at an excessive speed, thereby

---

(Continuation of footnote 10):

right of way which prevented a clear view of the crossing.  Plaintiff lists numerous policies of Norfolk Southern regarding reporting and removing sight obstructions with which defendant allegedly failed to comply.  Plaintiff's Statement of Facts, Exhibit 14.

Plaintiff further contends that the crossbucks at the Diller Avenue crossing did not conform to federal regulations regarding their placement and their reflectivity, which additionally violated Norfolk Southern's internal policies regarding defective warning signs.  Plaintiff's Brief in Opposition, page 16 n.11; Plaintiff's Statement of Facts, Exhibit 14.

Defendant avers that plaintiff has failed to establish how these policies were "created pursuant to a regulation or order issued" by either the Secretary of Transportation or the Secretary of Homeland Security as required by 49 U.S.C. § 20106(b)(1)(B).  Plaintiff contends that the policies were issued pursuant to 49 C.F.R. §§ 217.7, 217.11, and 218.1.

However, these regulations are not on point because they merely require a railroad to keep copies of its operating rules and timetables, 49 C.F.R. § 217.7, and to keep records of its program of instruction for employees to learn the railroad's operating rules, 49 C.F.R. § 217.11.  Further, 49 C.F.R. § 218.1 merely states that the regulations provide minimum requirements for a railroad's operating rules, but that railroads are free to prescribe more stringent requirements.  Plaintiff has failed to identify any regulation requiring Norfolk Southern to adopt the alleged policies at issue.

Further, nothing in 49 U.S.C. § 20106 provides a private right of action for a railroad's failure to comply with any internal policy which it created, which policy was not otherwise created pursuant to a federal order or regulation.  Plaintiff's broad interpretation of an internal policy created "pursuant to a regulation" is not supported by the text of section 20106.  Such an interpretation would discourage railroads from otherwise implementing internal policies in order to avoid additional self-imposed duties of care.

Finally, plaintiff has failed to establish a genuine issue of material fact regarding plaintiff's claim that the crossbucks were not properly placed or sufficiently reflective.  A fact is material only if it may affect the outcome of a case.  Anderson, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211.  Because plaintiff has acknowledged that he knew the location of the crossbucks, he knew what they meant, and he knew the location of the railroad crossing, additional maintenance of the crossbucks would not change the outcome of the case.

violating a common-law duty to exercise ordinary care at a crossing.

Defendant contends plaintiff's claim is preempted to the extent it relies on the allegation of excessive speed. Defendant alleges that 49 C.F.R. § 213.9, promulgated pursuant to the FRSA, establishes the speed limit for a Class 3 track as forty miles per hour.  Defendant contends that Norfolk Southern employees William F. Gould Jr. testified in his deposition, and Paul Sciotti stated under oath in his affidavit, that the Diller Avenue crossing track is Class 3.  Because plaintiff concedes that the train was traveling at about twenty-four miles per hour, which was within the forty miles per hour speed limit, defendant avers plaintiff is preempted from arguing that additional common-law duties required Norfolk Southern to operate the train at a slower speed.

I conclude that defendant is correct that common-law negligence claims for excessive speed are preempted by federal law where the train was traveling at a speed that was in accordance with the applicable speed established in 49 C.F.R. § 213.9.

The speed limit for a Class 3 track is forty miles per hour.  49 C.F.R. § 213.9.  The speed limit for a Class 2 track is twenty-five miles per hour, and the speed limit for a Class 1 track is ten miles per hour.  49 C.F.R. § 213.9.

The United States Supreme Court has held that section 213.9 preempts a common-law claim for negligence based on excessive speed because the speed limits are determined by taking into account the hazards posed by the track conditions, including their gage, alignment, curvature, surface uniformity, and number of crossties per length of track.  Easterwood, 507 U.S. at 674-676, 113 S.Ct. at 1742-1744, 123 L.Ed.2d at 402-404; see also Bouchard, 196 Fed.Appx. at 72.

Accordingly, the Supreme Court ruled that "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation", including state common-law excessive speed claims, that would impose stricter speed constraints on railroads.  Easterwood, 507 U.S. at 674-675, 113 S.Ct. at 1742-1743, 123 L.Ed.2d at 402-404.

This conclusion accords with the intent of Congress to create a national system of train standards under the FRSA. 49 U.S.C. § 20106(a); Easterwood, 507 U.S. at 661-663, 113 S.Ct. at 1736-1737, 123 L.Ed.2d at 394-396.  Therefore, plaintiff is preempted from claiming that Norfolk Southern had a common-law duty to operate the train at a slower speed.

Plaintiff concedes that defendant's preemption analysis may have precluded his claim prior to the 2007 amendments to the FRSA.  However, plaintiff argues that the 2007 amendments to 49 U.S.C. § 20106(b) supercede Easterwood and allow plaintiff to

-33-

bring a common-law cause of action for negligence based upon excessive speed.

I reject plaintiff's argument for the following reasons.  Courts which have considered this issue have overwhelmingly held that even after the 2007 amendments, state-law excessive speed claims are still preempted pursuant to Easterwood.  See Henning, 530 F.3d at 1216; Gauthier v. Union Pacific Railroad Co., 644 F.Supp.2d 824, 838 (E.D.Tex. 2009); Murrell, 544 F.Supp.2d at 1150-1151; Kill, 923 N.E.2d at 1208.

Furthermore, the Supreme Court in Easterwood based its conclusion, in part, on the fact that state common-law requirements that a train operate at a slower speed than allowed by federal law are, pursuant to the express preemption provision of the FRSA, "'incompatible with'" 49 C.F.R. § 213.9. 507 U.S. at 675, 113 S.Ct. at 1743, 123 L.Ed.2d at 404 (quoting 45 U.S.C. § 434).  The Supreme Court reasoned that the regulations on track speed determine what constitutes a safe speed for that particular stretch of track, and that more stringent state laws would be incompatible with this determination and would violate the express preemption provision in the FRSA.  Easterwood, 507 U.S. at 673-674, 113 S.Ct. at 1742, 123 L.Ed.2d at 402-403.

The post-2007 amendment FRSA preemption provision, 49 U.S.C. § 20106(a)(2)(B), contains language identical to the

-34-

earlier version interpreted in Easterwood.  Section 20106 continues to provide that laws related to railroad safety "shall be nationally uniform to the extent practicable", 49 U.S.C. § 20106(a)(1), and that a state cannot adopt a law that is "incompatible with" a federal law or regulation.  49 U.S.C. § 20106(a)(2).

Furthermore, the 2007 amendments explicitly note that, although plaintiff may bring a cause of action for failure to comply with a state law, the law "must not be incompatible with subsection (a)(2)".  49 U.S.C. § 20106(b)(1)(C).  This internal reference to the express preemption provision in section 20106(a)(2), which language is identical to the language interpreted in Easterwood, shows that state laws regarding railroad safety are generally preempted.  (The three limited exceptions identified in Easterwood are not applicable in this case.)  Accordingly, the 2007 amendments do not supercede the Easterwood ruling that common-law claims regarding excessive speed are preempted.

Plaintiff contends that his claim is nonetheless not preempted because defendant has not established that the track classification for the Diller Avenue crossing was Class 3 (with a corresponding forty-mile-per-hour speed limit).  This is relevant because if plaintiff can show that the train exceeded the speed limit for the applicable track classification, such a violation

would render his excessive-speed negligence claim un-preempted, and he would be able to proceed with the state negligence claim. See 49 U.S.C. § 20106; Easterwood, 507 U.S. at 673, 113 S.Ct. at 1742, 123 L.Ed.2d at 402-403.

Specifically, plaintiff avers that the testimony of Norfolk Southern employee Gould, upon which defendant relies to establish that the track in question is Class 3, is "problematic".  He labels the testimony problematic because Mr. Gould testified that he was unsure how the speed was set and whether sight obstructions should have been taken into account.[11] Plaintiff contends that because of the sight obstruction posed by Shooter's Crossing, the track should not have been set as a Class 3 track.

Further, plaintiff claims that Norfolk Southern trainmaster, Terrence L. Albright, stated that the track was Class 2 on an internal accident report.  In addition, plaintiff alleges that defendant listed the track as Class 2 on an accident report submitted to the FRA.

Finally, plaintiff claims that defendant has reported in documents submitted to the United States Department of Transportation that the track was Class 1.[12]  Therefore,

---

[11]     Plaintiff's Brief in Opposition, page 12.

[12]     Plaintiff's Brief in Opposition, pages 12-13.

plaintiff contends that there is a genuine issue of material fact concerning the actual or proper track classification, and therefore the applicable speed limit.

As noted above, section 213.9 provides that the speed limit for a Class 2 track is twenty-five miles per hour, and the speed limit for a Class 1 track is ten miles per hour.  Plaintiff produced two expert reports which conclude that had the train been operating at ten miles per hour, the accident either would not have happened or would have been avoidable.  It is undisputed that the train was traveling approximately twenty-four or twenty-five miles per hour at the time of the collision.

In challenging defendant's assertion that the track is Class 3, plaintiff appears to be making two separate arguments. First, he appears to contend that even assuming defendant has established that it classified the relevant track as Class 3, defendant should have classified the track as either Class 1 or 2 because of the limited sight distances available given the Shooter's Crossing obstruction.

Plaintiff is correct that railroads are responsible for setting and maintaining the track classification.  According to the FRA:

> Railroads set train speed in their timetable or train orders.  Once a railroad sets a train speed, it must then maintain the track according to FRA standards for the class of track that corresponds to that train speed....[T]he agency holds railroads responsible for minimizing the risk of

-37-

derailment by properly maintaining track for the
speed they set themselves.

63 Fed.Reg. 33992, 33998-33999 (June 22, 1998).

Federal track safety standards are set out in 49 C.F.R.
§§ 213.1-213.369.  Plaintiff appears to be arguing that the track
was only maintained in accordance with the federal standards for
either a Class 1 or Class 2 track because of the limited sight
distances.

Even assuming that the federal track safety standards
create "Federal standard[s] of care" for the purposes of
49 U.S.C. § 20106(b)(1)(A), which would render plaintiff's claim
un-preempted, plaintiff has failed to identify any such standard
which defendant violated in classifying the Diller Avenue
crossing as a Class 3 track.  Plaintiff has neither pled nor
established that defendant failed to comply with any federal
regulations regarding the classification, maintenance, or
inspection of the track.

Accordingly, to the extent plaintiff argues that
defendant should have lowered the track classification from
Class 3, plaintiff's argument remains preempted by the FRSA
because plaintiff has failed to establish that defendant violated
a federal standard of care.

Plaintiff's second argument appears to be that
defendant itself has identified the Diller Avenue crossing track
as Class 1, 2, and 3 in various documents.  Plaintiff avers that

accident reports submitted to the FRA, which list the track as Class 2, and the documents submitted to the United States Department of Transportation, which list the track as Class 1, create a genuine issue of material fact regarding the actual track classification.

Defendant contends that the documents on which plaintiff relies to establish that the track is Class 2 are not admissible because federal regulations prevent accident reports created pursuant to 49 C.F.R. § 225.7 from being used to establish liability.  Further, defendant contends that the accident reports, and the documents on which plaintiff relies to establish that the track is Class 1, are also inadmissible pursuant to 23 U.S.C. § 409.

To demonstrate that the track is actually Class 1, plaintiff has produced nine documents, dated from January 1970 to August 2010.  These documents were submitted by Norfolk Southern to the United States Department of Transportation ("DOT").  Each document is entitled "U.S. DOT- Crossing Inventory Information".  For the following reasons, I conclude that 23 U.S.C. § 409 renders these documents inadmissible.

In this regard, Section 409 provides as follows:

> Notwithstanding any other provision of law,
> reports, surveys, schedules, lists, or data
> compiled or collected for the purpose of
> identifying, evaluating, or planning the safety
> enhancement of potential accident sites, hazardous
> roadway conditions, or railway-highway crossings,

> pursuant to sections 130, 144, and 148 of this
> title or for the purpose of developing any highway
> safety construction improvement project which may
> be implemented utilizing Federal-aid highway funds
> shall not be subject to discovery or admitted into
> evidence in a Federal or State court proceeding or
> considered for other purposes in any action for
> damages arising from any occurrence at a location
> mentioned or addressed in such reports, surveys,
> schedules, lists, or data.

23 U.S.C. § 409.

As relevant to this case, section 409 precludes admission of the following:

> (1) reports, surveys, schedules, lists or data;
>
> (2) compiled or collected;
>
> (3) for the purpose of identifying, evaluating, or planning the safety enhancement of railway-highway crossings;
>
> (4) pursuant to 23 U.S.C. § 130.

The United States Supreme Court has held that section 409 creates an evidentiary privilege, which must be construed narrowly because privileges impede the search for the truth. Pierce County, Washington v. Guillen, 537 U.S. 129, 145, 123 S.Ct. 720, 730, 154 L.Ed.2d 610, 626 (2003).  Further, the burden is on defendant to establish that the information they seek to protect falls within the statute.  Stokes v. National Railroad Passenger Corp., 2009 WL 3261928, at *2 (E.D.Pa. Oct. 7, 2009)(Stengel, J.).

In interpreting the scope of section 409, the United States Supreme Court explained that section 409 was enacted to

facilitate federal programs, including a Railway-Highway Crossings program, 23 U.S.C. § 130.  These programs were intended to assist states in identifying highways in need of improvements and in funding those improvements.  Guillen, 537 U.S. at 133, 123 S.Ct. at 724, 154 L.Ed.2d at 618.[13]

Because participation in these programs required states to disclose safety-related information that could expose them to liability, such as information related to potential accident sites, Congress adopted section 409 to encourage disclosure. Guillen, 537 U.S. at 133-134, 123 S.Ct. at 724-725, 154 L.Ed.2d at 619.

To determine whether section 409 applies, the relevant inquiry is whether the information was collected, generated, or compiled for the *purpose* of pursuing the objectives of one of the three identified federal programs in section 409, namely, 23 U.S.C. §§ 130, 144, and 148.  Guillen, 537 U.S. at 145-146, 123 S.Ct. at 730-731, 154 L.Ed.2d at 626.  Accordingly, section 409 does not protect information that was compiled, collected, obtained, and utilized for purposes unrelated to one of these

---

[13] The other two programs noted by the Supreme Court in Guillen are the Highway Bridge Replacement and Rehabilitation Program, 23 U.S.C. § 144, and the Hazard Elimination Program, 23 U.S.C. § 152, which are not relevant to this case.

It should be noted that in 2005, Congress amended section 409. Section 152 of Title 23 United States Code was replaced with 23 U.S.C. § 148.  Highway Safety Improvement Program, Pub. L. No. 109-59, Title I, § 1401(a)(3)(C), 119 Stat. 1225 (Aug. 10, 2005).

three programs.  <u>Guillen</u>, 537 U.S. at 146, 123 S.Ct. at 731, 154 L.Ed.2d at 626-627.

Here, the nine documents were submitted by defendant to the Department of Transportation pursuant to the "U.S. DOT National Highway-Rail Crossing Inventory Program".  Defendant contends that the documents were printed on forms from the program manual dated August 2007, entitled the U.S. DOT National Highway-Rail Crossing Inventory, Policies Procedures and Instructions for States and Railroads ("2007 manual").

The 2007 manual explains the genesis of the forms and attaches blank forms for the use of railroads and states.[14]  The blank forms included in the 2007 manual are identical to the documents on which plaintiff seeks to rely.[15]

The 2007 manual describes the purpose of the program as follows:

> The purpose of the U.S. DOT National Highway-Rail Crossing Inventory Program is to provide for the existence of a national inventory database that can be merged with accident files and used to analyze information for planning and implementation of crossing improvement programs by public and private agencies responsible for highway-rail crossing safety.  The National Inventory provides information to Federal, State, and local governments, as well as to the rail industry, for the improvement of safety at highway-rail intersections.  The Federal-Aid

---

[14]     Relevant portions of the 2007 manual, including copies of the blank forms, are attached to defendant's motion for summary judgment as Exhibit Vol. III, 17.

[15]     Plaintiff's Statement of Facts, Exhibit 8.

> Highway Act of 1973 (Section 203) requires that
> each State highway agency maintain an inventory of
> all public crossings, and accordingly, for the
> U.S. Department of Transportation (DOT) to
> establish and maintain a National Inventory of all
> public, private and pedestrian crossings.[16]

The 2007 manual additionally provides that "[t]he 1973 Federal-Aid Highway Act (Section 203) requires each State highway agency to maintain an inventory of public highway-rail crossings. The Act also required the railroads to gather that information and provide the States with related railroad information."[17]

The "Federal-Aid Highway Act of 1973 (Section 203)" referred to in the above quotation appears to refer to section 203 of public law number 93-87 which, in relevant part, was codified in 23 U.S.C. § 130.[18]  Section 130 was enacted as part

---

[16]     Motion for Summary Judgment, Exhibit Vol. III, 17, page 3.

[17]     Id.

[18]     The Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 121, 101 Stat 132 (1987), amended 23 U.S.C. § 130 and repealed section 203 of the Highway Safety Act of 1973.  The relevant language in section 130 has not been changed.

        Although it appears that section 203 of public law number 93-87 has been repealed, upon reviewing the briefs and exhibits it is clear that this reference in the manual is to the language that was ultimately codified in 23 U.S.C. § 130.

        Further, the short title for Section 203 of public law number 93-87 is the "Highway Safety Act of 1973" because section 203 appears in title II of the Act.  The short title for the sections appearing in title I of the Act is the "Federal-Aid Highway Act of 1973".

        Accordingly, the manual appears to refer to section 203 by the wrong short title, but it is clear from the import of the manual that it refers to section 203 of the Highway Safety Act of 1973.  See also, Shanklin, 529 U.S. at 348, 120 S.Ct. at 1471, 146 L.Ed.2d at 379 ("Three years after passing the FRSA, Congress enacted the Highway Safety Act of 1973, § 203, 87 Stat. 283, which, among other things, created the Federal Railway-Highway Crossings Program (Crossings Program), see 23 U.S.C. § 130.").

of the Highway Safety Act of 1973, and it makes federal funding available to states for use in improving railroad crossings.

Section 130 requires states to "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d). In addition, section 130 establishes a "national crossing inventory" which requires states to periodically report information regarding warning devices and signs at public railroad crossings. 23 U.S.C. § 130(l).

23 C.F.R. § 924.9, which implements 23 U.S.C. § 130, requires states to collect and maintain "railway-highway grade crossings inventory data" in carrying out the highway safety improvement program established in 23 U.S.C. § 130. See 23 C.F.R. § 924.3. According to the National Highway-Rail Crossing Inventory Instructions and Procedures Manual (December 1996), the FRA is the custodian of the national inventory, and a state's participation in the national inventory satisfies the federal requirement that a state collect and maintain a state inventory.[19]

---

[19]     National Highway-Rail Crossing Inventory Instructions and Procedures Manual, December 1996, section 1.2, available at http://www.fra.dot.gov/rrs/pages/fp_1499.shtml.

The 2007 version of the manual additionally explains that portions of the attached form are to be filled out by a railroad, while another portion is to be filled out by the respective state wherein the crossing is located.[20]  Accordingly, it appears that a state participates in the national inventory by utilizing the forms attached to the 2007 manual.

The information provided in the 2007 manual satisfies the plain language of section 409 for purposes of privilege. Evaluating the four components of section 409 identified above, the documents are surveys which are compiled and collected by railroads, states, the FRA, and the United States Department of Transportation.  According to the 2007 manual, this information is collected "for planning and implementation of crossing improvement programs" and is to be used "for the improvement of safety at highway-rail intersections".[21]

Accordingly, the information also appears to satisfy the purpose requirement identified in section 409, which is to identify, evaluate, and plan for the safety enhancement of railway-highway crossings.   23 U.S.C. § 409.

Finally, it appears that the documents were compiled and collected pursuant to 23 U.S.C. § 130.  The 2007 manual states that the crossing inventory program was implemented to

---

[20]    Motion for Summary Judgment, Exhibit Vol. III, 17, page 6.

[21]    Motion for Summary Judgment, Exhibit Vol. III, 17, page 3.

fulfill the mandate of section 203 of the Federal-Aid Highway Act
of 1973.  The language in section 203 was ultimately codified in
23 U.S.C. § 130.  Further, section 130 particularly identifies
the national crossing inventory, and provides the Secretary of
Transportation with rule-making authority to implement the
national highway-rail crossing inventory policy, procedures, and
instructions for states and railroads.  23 U.S.C. § 130(l).

Therefore, I hold that the documents entitled "U.S.
DOT- Crossing Inventory Information" are not admissible pursuant
to 23 U.S.C. § 409.  Accord, Dugle v. Norfolk Southern Railway
Company, 2010 WL 1948214, at *1-4 (E.D.Ky. May 12, 2010).

Because the documents are not admissible at trial, they
are not competent evidence from which a jury could conclude that
the track is classified as Class 1.  Ridgewood, 172 F.3d at 252.
Plaintiff identifies no other evidence in support of this
contention and therefore there is no genuine issue of fact
regarding whether the track was Class 1.

The accident report created for plaintiff's accident on
June 12, 2008 and submitted to the FRA states that the Diller
Avenue crossing track is Class 2.  Federal statutes and
regulations make clear that this document is inadmissible for the
purpose of establishing defendant's liability.[22]

---

[22]    Plaintiff provides nine additional accident reports created for
the FRA regarding past accidents at the Diller Avenue crossing in order to

(Footnote 22 continued):

Section 20901 of Title 49 United States Code requires a railroad to file a monthly report with the Secretary of Transportation "on all accidents and incidents resulting in injury or death to an individual" that arise from operations during the month.  Section 20903 states that "[n]o part of an accident or incident report filed by a railroad carrier under [49 U.S.C. § 20901]...may be used in a civil action for damages resulting from a matter mentioned in the report."

Further, the FRA regulations promulgated pursuant to 49 U.S.C. § 20903 establish that the June 12, 2008 accident report submitted by defendant is the type of report prohibited for use in a civil action for damages.  The relevant report[23] is entitled a "highway-rail grade crossing accident/incident report" prepared using Form 6180.57, which a railroad is required to submit to the FRA under 49 C.F.R. § 225.19.

Under 49 C.F.R. § 225.11, these reports are required to be submitted monthly to the FRA.  The monthly reports submitted pursuant to section 225.11 "may not be admitted as evidence or

---

(Continuation of footnote 22):

show the alleged dangerousness of the crossing.  Plaintiff's Statement of Facts, Exhibit 9; Plaintiff's Brief in Opposition, page 5.

Because these accident reports created for the FRA are governed by the same federal statutes and regulations as the June 12, 2008 accident report, I conclude that they are also inadmissible for the purpose of establishing defendant's liability.

[23]    Plaintiff's Statement of Facts, Exhibit 9.

-47-

used for any purpose in any action for damages growing out of any matters mentioned in those monthly reports."  49 C.F.R. § 225.7.

Accordingly, the accident report submitted to the FRA may not be utilized to establish that the Diller Avenue crossing track was Class 2.  Because this document is not admissible pursuant to federal regulations, I do not reach defendant's argument that the June 12, 2008 accident report is also inadmissible pursuant to 23 U.S.C. § 409.

However, plaintiff has additionally identified an accident report created by Norfolk Southern trainmaster Albright which appears to have been created for Norfolk Southern's internal use, rather than for submission to the FRA.  During his deposition, Mr. Albright stated that he created this document. The document provides that the relevant track class is 2.[24] Defendant has not identified any statutes or regulations governing this report which would make it inadmissible.

Accordingly, plaintiff has produced competent evidence from which a jury could reasonably conclude that the actual track classification is Class 2.  Ridgewood, 172 F.3d at 252.  Because defendant contends the track is Class 3, a factual dispute exists regarding the actual track classification.

Nevertheless, I conclude that plaintiff has failed to establish that the dispute is material.  As previously noted, the

---

[24]    Motion for Summary Judgment, Exhibit Vol. I, O, Deposition Exhibit 2.

speed limit for a Class 2 track is twenty-five miles per hour.
49 C.F.R. § 213.9.  The parties agree that at the moment of
impact, the train was traveling twenty-four miles per hour.

Although plaintiff and plaintiff's experts continually
refer to the train's speed at twenty-four miles per hour,
plaintiff's statement of facts lists the train's speed as twenty-
five to twenty-six miles per hour at the moment of impact.[25]  To
support this assertion, plaintiff cites printouts provided by
Norfolk Southern of a second-by-second breakdown of the train's
speed obtained from the Event Data Recorders.[26]

However, plaintiff does not explain how the documents
support this conclusion, which is at odds with the interpretation
of the documents rendered by Terrence Richey, a Norfolk Southern
district claim agent.  Mr. Richey testified that the train was
traveling at twenty-four miles per hour at the moment of impact
and for a quarter of a mile beforehand.[27]

Further, a review of the second-by-second breakdown
reveals that the train's speed was either twenty-four or twenty-
five miles per hour at the moment of impact, but that a little
less than a minute before the impact, and slightly over a quarter
of a mile west of the crossing, the train was traveling between

---

[25]     Plaintiff's Statement of Facts, page 4.

[26]     Motion for Summary Judgment, Exhibit Vol. II, D-5 and D-10.

[27]     Motion for Summary Judgment, Exhibit Vol. I, K, page 14.

twenty-six and twenty-seven miles per hour.  Plaintiff cites no competent evidence that the train was traveling at twenty-six miles per hour when Mr. Zimmerman collided with the train.

Assuming that the track was a Class 2 track with a twenty-five mile per hour speed limit, and that the train was traveling slightly above the speed limit over a quarter of a mile prior to reaching the Diller Avenue crossing, such facts are not material because plaintiff does not contend that this alleged violation caused the accident.  Plaintiff neither pled nor contends that if the train had been traveling under twenty-five miles per hour, the outcome of the case would be different.

Both of plaintiff's experts opine that if the train had been traveling at ten miles per hour, the accident would have been avoidable because either the train would have missed Mr. Zimmerman or Mr. Zimmerman would have had sufficient time to stop his motorcycle.  However, plaintiff does not contend that defendant's potential violation of the twenty-five mile per hour speed limit caused or in any way contributed to the train's ultimate collision with Mr. Zimmerman or the damage he sustained.

Therefore, I conclude that the dispute regarding whether the track was Class 2 or Class 3 is not material because it would not affect the outcome of the case.  Anderson, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211.  Moreover, there is no genuine issue of material fact that the train was

traveling within the speed limit for either Class 2 or Class 3 at the time of the impact.  Accordingly, the portion of plaintiff's claim in Count I alleging that Norfolk Southern was negligent because it operated the train at an excessive speed is preempted by federal law.[28]

<u>Negligence for Failure to Warn of Approaching Train</u>

Count I of plaintiff's Complaint also contains a state-law negligence claim for failure to warn of an approaching train.

According to the Third Circuit, railroads continue to have a common law duty under Pennsylvania law to "exercise ordinary care at a crossing by adopting a reasonably safe and effective method, commensurate with the dangers of a particular crossing, of warning travelers of the approach of the train." <u>Strozyk</u>, 358 F.3d at 277 (quoting <u>National Freight</u>, 698 F.Supp. at 78); <u>see also</u> <u>Bouchard</u>, 196 Fed.Appx. at 70; <u>Dobransky</u>, 31 Pa. D. & C.4th at 61.

---

[28]      Plaintiff further contends, similar to his argument regarding defendant's policies on sight obstructions and crossbucks, that the 2007 amendments to the FRSA, 49 U.S.C. § 20106(b), empowers him to bring a claim for negligence based upon defendant's failure to abide by its internal policies regarding speed limits.  Defendant contends that its internal timetable speed is thirty miles per hour.  Plaintiff contends, based upon defendant's reporting to the United States Department of Transportation, that defendant's internal timetable speed is ten miles per hour.

         There is no dispute that the train was operating under thirty miles per hour.  Plaintiff seeks to rely on the U.S. DOT- Crossing Inventory Information documents to establish that defendant's internal timetable speed was ten miles per hour.

         Because I have held that these documents are inadmissible, and because plaintiff has adduced no other evidence on this issue, plaintiff has not established that defendant violated any internal policies by traveling twenty-four miles per hour.  Accordingly, I do not need to address whether 49 U.S.C. § 20106(b) permits this claim.

The railroad's duty of care is "heavily fact-
contingent, with all the conditions being relevant." Strozyk,
358 F.3d at 277; see also Buchecker v. The Reading Company,
271 Pa.Super. 35, 46-47, 412 A.2d 147, 153 (Pa.Super. 1979).

Courts consider the effect of all types of conditions
and obstructions when determining the railroad's duty to warn,
with no single factor being dispositive. Strozyk, 358 F.3d
at 278.

Plaintiff alleges that Norfolk Southern breached its
duty to warn of an approaching train because the train was
traveling at an excessive speed, the train was operating without
lights, and the train's horn was not adequately sounded.

As discussed above, plaintiff's claim in Count I that
the train was operating at an excessive speed is preempted by
federal law.

Regarding the sounding of the train's horn, plaintiff
avers that although he does not recall whether the train sounded
its horn as he approached the Diller Avenue crossing, "had [he]
heard a horn sound prior to the accident, [he] would have
stopped" sooner.[29] This statement from plaintiff's affidavit is
the only place in the record which suggests that the train's horn
was not sounded. Conversely, defendant has adduced significant

---

[29]    Plaintiff's Statement of Facts, Exhibit 1, page 2.

evidence from which the jury could conclude that the horn did sound.

Two witnesses who were traveling in the car sixty feet behind plaintiff stated that they heard the train sounding its horn.[30]  Further, Mr. Eppley and Mr. Romberger stated that they sounded the train's horn,[31] which information is confirmed by the train's Event Data Recorders.[32]

Because plaintiff does not remember the accident, he has not actually stated that the train's horn was not sounded. Instead, his affidavit makes a purely speculative assertion that if the train's horn had been sounded, he would have heard it and he also would have stopped at the crossing.

However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

---

[30]     Plaintiff's Statement of Facts, Exhibits 5 and 6.

[31]     Motion for Summary Judgment, Exhibit Volume I, E and F.

[32]     Motion for Summary Judgment, Exhibit Volume I, Exhibit G and Exhibit K, pages 15-16.

        Plaintiff contends that the chain of custody provided by defendant for the Event Data Recorders is facially deficient.  However, the relevant information provided by the Event Data Recorders is corroborated by Mr. Eppley and Mr. Romberger.

        Accordingly, without deciding the validity of plaintiff's contention regarding chain of custody of the data recorders, I conclude that defendant has provided sufficient undisputed evidence establishing that the train's horn was sounded.  That is, even if I were to disregard the data recorder evidence, I would still conclude that there is undisputed evidence that the horn was sounded.

Accordingly, plaintiff cannot sustain his failure-to-warn claim based upon this speculative allegation.

Finally, plaintiff alleges that the train's lights were not operating when it passed through the Diller Avenue crossing. Plaintiff makes a similar contention that even though he does not recall the accident, he would have stopped at the crossing if he had seen the train's lights.

Mr. Romberger and Mr. Eppley stated that the headlights of the train were on, and that the train had two auxiliary lights that oscillate whenever the train's horn is sounded.  However, the witnesses in the car following plaintiff also stated that they did not see lights.[33]  Thus, it appears that there is a dispute regarding whether the lights were on.

However, plaintiff additionally contends that because of the angle of the track and the location of Shooter's Crossing, he would not have been able to see the lights as he approached the track even if the lights had been on.  Therefore, the factual dispute regarding the train's lights is not material because it would not impact the outcome of the case.  Anderson, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211.

Plaintiff has acknowledged that, because he would not have been able to see them, the lights would not have provided

---

[33]     Motion for Summary Judgment, Exhibit Volume I, E and F.

sufficient warning of the approaching train even if they had been illuminated.  Therefore, the lights are immaterial.

To the extent that plaintiff argues that defendant could have provided sufficient warning of the approaching train with automatic gates and flashing lights, this claim is preempted by federal law, as discussed above.

Therefore, plaintiff has presented no evidence that defendant breached a duty of care, and plaintiff cannot sustain a prima facie claim of negligence in Count I for failure to warn. Rooney, 623 F.Supp.2d at 660.

Accordingly, I grant defendant's motion for summary judgment on plaintiff's negligence claims in Count I, and enter judgment in favor of defendant and against plaintiff on that claim.  As discussed above, I also enter summary judgment in defendant's favor on Counts II and III.[34]

### Punitive Damages

Plaintiff's claim in Count IV seeks punitive damages for defendant's alleged negligence.  Punitive damages are a form of relief, and are not the basis for an independent cause of action.  Butler v. Yamaha Motor Co., Ltd., 1992 WL 170882, at *6 (E.D.Pa. July 9, 1992)(Waldman, J.).

---

[34]     Because I am granting defendant's motion for summary judgment, I do not need to consider defendant's additional arguments that plaintiff was comparatively negligent by failing to comply with Pennsylvania law.

It is settled law in Pennsylvania that one cannot recover punitive damages independently from an underlying cause of action.  <u>DiGregorio v. Keystone Health Plan East</u>, 840 A.2d 361, 370 (Pa.Super. 2003)(citing <u>Hilbert v. Roth</u>, 395 Pa. 270, 149 A.2d 648 (1959)).

Accordingly, because I have granted summary judgment in defendant's favor on each of plaintiff's substantive claims, I dismiss Count IV as moot.

<u>CONCLUSION</u>

For all the foregoing reasons, I grant Defendant's Motion for Summary Judgment, and I enter judgment in favor of defendant and against plaintiff on Counts I, II, and III. Plaintiff's claim for punitive damages set forth in Count IV is dismissed as moot.